# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ROBERT E. GROSHON, | ) |
| Plaintiff, | ) No. 12 C 7591 |
| v. | ) Hon. Virginia M. Kendall |
| TRANS UNION, LLC, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Robert E. Groshon sued Defendant Trans Union, LLC ("Trans Union") for age discrimination (Count I) and retaliation (Count II) related to the termination of his employment with Trans Union pursuant to the Age Discrimination Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq*. Trans Union moves for summary judgment. For the reasons stated below, Trans Union's motion is denied as to Count I and granted as to Count II.

## UNDISPUTED FACTS[1]

### I. Trans Union Hires Groshon

Trans Union is a credit information and information management services company with its headquarters in Chicago, Illinois. (Dkt. No. 23 at p. 2.) On June 1, 1995, Trans Union hired Groshon as a full-time Desktop Service Technician. (*Id.*) At the time, Groshon was 41 years old. (*Id.*) Throughout his employment with Trans Union, Groshon held the same position performing IT support duties. (*Id.* at p. 4.) Groshon's general responsibilities included

---

[1] Groshon's Response to Trans Union's Local Rule 56.1 Statement of Material Facts is cited as: "Dkt. No. 23 at p. ___." Trans Unions Response to Groshon's Local Rule 56.1 Statement of Additional Material Facts is cited as: "Dkt. No. 41 at p. ___." The Court does not consider Trans Union's Reply to Groshon's Response to Trans Union's Statement of Facts (Dkt. No. 40) because Local Rule 56.1(a) does not permit such a filing. Groshon's Motion to Strike Trans Union's "Reply to Certain of Plaintiff's Responses to Defendant's Statement of Undisputed Material Facts." (Dkt. No. 43) is therefore granted.

1

addressing and resolving associates' computer problems and assisting with computer upgrades or changes, known as "deployments." (*Id.* at p. 5.) Periodically, Groshon was assigned projects outside of these general responsibilities. (Dkt. No. 41 at p. 1.) When he was hired, and periodically throughout his employment with Trans Union, Groshon acknowledged receipt of the Trans Union company handbook, which contained its Equal Employment Opportunity Policy. (Dkt. No. 23 at pp. 2–3.) Groshon understood that he could report any complaints to Trans Union's Human Resources Department or utilize the 24-hour toll-free employee Hot Line available to all Trans Union Associates. (*Id.* at pp. 3–4.)

## II.     Groshon's Job Performance

### A.     Positive Feedback During the Late 1990s and Early 2000s

In March 1996 and March 1997, Groshon's supervisors recommended that he receive merit pay increases. (Dkt. No. 41 at p. 2.) Between late 1999 and 2002, Groshon received numerous "MVP" awards, based on co-worker nominations, under a program that ended in 2002. (Dkt. No. 41 at p. 2; Dkt. No. 28 at pp. 3–15; Dkt. No. 32 at pp. 1–7.) Also during the 1990s, Groshon received numerous "ThanQ" notes from various co-workers, a program that was also discontinued. (Dkt. No. 41 at p. 3; Dkt No. 32 at pp. 9–16.)

### B.     Performance Evaluations, 2001 – 2008

Throughout his employment, Groshon received annual performance evaluations. (Dkt. No. 23 at p. 5.) In Trans Union's annual evaluations, a rating between 2.00 and 2.98 is defined as "Meets job requirements;" a rating between 2.99 and 3.00 is "Exceeds job requirements." (*E.g.*, Dkt. No. 25 at p. 27.) Groshon was consistently ranked in the category of "meeting expectations." (Dkt. No. 23 at p. 5.) Groshon interpreted this rating to mean he was doing his job correctly. (*Id.* at p. 6.) In 2001, Jason Centanni, Groshon's supervisor, praised Groshon's

2

performance and gave him a rating of 2.30 out of 3.00. (Dkt. No. 25 at p. 27.) Groshon received a 2.14 in his 2003 evaluation, and was asked therein to complete two computer certifications. (Dkt. No. 23 at p. 6.) Groshon did not complete this training because he believed he could handle his work without those certifications and learned a lot on his own. (*Id.*)

In Groshon's 2007 annual evaluation, his supervisor at the time, Frank Vasquez, rated him at 1.91, in the "not meeting job requirements" category. (Dkt. No. 19-1 at p. 30.) Groshon's overall rating was based, in large part, on rating of 1.00 he received for failing to obtain Microsoft MCDST Certification, which constituted 15% of his overall numerical rating. (*Id.*) Groshon was rated 2.00 or 3.00 in every other category. (*Id.*) Groshon disagreed with his overall rating. (Dkt. No. 23 at p. 8.) In April and June of 2007, Vasquez also issued Groshon two written reprimands—a formal Manager Discussion and a First Written Notice of Performance, both of which Groshon also disagreed with. (*Id.* at p. 9.) Groshon believed Vasquez was "out to get him" because Vasquez was supposedly jealous and upset that co-workers bypassed Vasquez and went straight to Groshon for help. (*Id.*)

In 2008, in a modified annual evaluation form completed by Orhan Duyar that did not include Microsoft MCDST Certification, Groshon's overall rating was 2.02. (Dkt. No. 19-1 at pp. 39–42.) In the "Service" portion of the evaluation, Duyar states, "[Groshon] is always willing to help others, and the reason he exceeds in this category is because he really like[s] to help others, not because his job requires [him] to do so, he always has [a] positive attitude and it doesn't matter how much work is waiting for him early in the morning; Once, [Groshon] was paged at 7 AM, he was at 525, in five minutes Bob was already at 555 helping the customer." (*Id.* at pp. 39–40.) In "Administration," Duyar wrote, "Bob was not putting required information into our ticketing system for the work he was doing. Most of his tickets were lacking

information about the solutions of the problem, actions taken, etc. For the second half of the year he improved in that area. Bob is expected to keep his improvement and make it one of his strength[s]." (*Id.* at p. 40.)

    **C.**    **Laura Rabattini's Evaluations of Groshon's Job Performance, 2009 – 2011**

Laurie Rabattini became Groshon's supervisor in September 2009. (Dkt. No. 23 at p. 10.) At the end of 2009, Rabattini completed a year-end review of Groshon's work. (*Id.*) The evaluation was generally positive, noting areas for improvement and giving Groshon specific deadlines to complete certain tasks. (*Id.* at pp. 10–11.) Groshon agreed with this performance evaluation and signed it in February 2010. (*Id.* at p. 10.)

In April 2010, Rabattini counseled Groshon on his handling of open tickets and issued him a Performance Improvement Plan. (*Id.* at p. 7; Dkt. No. 41 at p. 6.) "Open tickets" are requests from Trans Union employees for assistance with computer problems. (Dkt. No. 41 at p. 6.) She had previously met with her entire staff and informed them that Trans Union was raising the "bar" regarding the handling service request tickets, improving closing ticket times, and completing requests. (Dkt. No. 23 at p. 11.) During April 2010, Groshon and one other technician were primarily responsible for responding to employee service tickets, which necessarily caused the number of Groshon's open tickets to increase. (Dkt. No. 41 at p. 6.) Rabattini discussed Groshon's handling of tickets with him again in July 2010. (Dkt. No. 23 at p. 12.) He disagreed with her assessment of his performance and contacted Shelegh Hyzny from Trans Union Human Resources in Chicago regarding this disagreement in July 2010. (Dkt. No. 41 at p. 24.) Rabattini also began meeting with Groshon and sometimes Groshon's team leader, Baron Rush, on a regular basis to review Groshon's performance. (*Id.* at p. 6.) Groshon

4

continued to meet with Rabattini throughout August, September, October, and November of 2010. (Dkt. No. 23 at p. 12.)

In October 2010, Rabattini assigned Groshon a standardization project to upgrade and track 215 Trans Union employees' new laptop computers. (Dkt. No. 41 at pp. 20–21.) Rabattini requested that the project be completed in Microsoft Project. (Dkt. No. 23 at p. 12.) Groshon received help from another employee to create the project template in Microsoft Project. (*Id.*) Groshon then discovered that Microsoft Project was calculating certain percentages incorrectly, and subsequently received Rabattini's approval to complete the first draft in Microsoft Excel. (Dkt. No. 41 at p. 21.) With the correct figures, Groshon later created a version of the project in Microsoft Project. (Dkt. No. 23 at pp. 15–16.) The 215 employees all timely received their new laptops. (Dkt. No. 41 at p. 21.) Shortly thereafter, Groshon received a performance evaluation for 2010 in which Rabattini rated Groshon as not meeting expectations. (Dkt. Nos. 23 at p. 17; 19-1 at pp. 69–74.) He also received a Performance Improvement Plan for 2010. (Dkt. No. 23 at p. 17.) On March 17, 2011, Groshon received a Formal Written Warning from Rabattini. (Dkt. Nos. 23 at p. 17; 19-1 at pp. 57–58.) Groshon was surprised to receive this warning because he believed he was following Rabattini's instructions. (Dkt. No. 41 at p. 22.)

### D. Groshon's Performance Compared to His Peers

Based on his meetings with Rabattini, Groshon began printing out Unicenter data sheets on August 31, 2010. (*Id.* at p. 8.) Unicenter is the central database that Trans Union's computer technicians used to track and log their work. (Dkt. No. 25 at ¶ 6.) These data sheets contained the number of open tickets that Groshon and his colleagues had on the specific date he printed them. (Dkt. Nos. 41 at p. 8; 25 at ¶¶ 6–8.) Groshon printed out two types of Unicenter data sheets, both containing roughly the same information but in slightly different levels of detail: the

"Request List" and the "Request Detail." (Dkt. Nos. 41 at p. 8; 25 at ¶¶ 6–8.) The printouts show that, on numerous occasions in 2010 and 2011, younger employees had more open tickets and tickets open for longer periods of time than Groshon. (Dkt. No. 41 at pp. 8–20.) Nevertheless, these younger employees generally received more positive feedback on their performance reviews than Groshon, who was criticized for the speed in which he closed tickets. (*Id.*)

### III. Groshon's Termination from Employment at Trans Union

On August 16, 2011, Rabattini and Groshon met to discuss his mid-year performance review. (Dkt. No. 23 at p. 21.) Also during the summer of 2011, Rabattini sent Groshon a text message stating that she planned to proceed with issuing a second and final warning related to his performance. (*Id.*) After receiving the text message, and sometime during July of 2011, Groshon contacted Trans Union's Human Resources Director, Pat Bradley. (Dkt. No. 23 at p. 22.) Groshon communicated to Bradley that he thought he was being singled out because of his age. (Dkt. No. 41 at p. 23.)

Groshon received a Final Warning on August 25, 2011. (Dkt. Nos. 23 at p. 26; 19-1 at pp. 60–61.) On November 1, 2011, Trans Union terminated Groshon. (Dkt. No. 23 at p. 28.) On November 14, 2011, Groshon filed a Charge of Discrimination with the EEOC alleging age discrimination. (Dkt. No. 23 at p. 28–29.) On May 5, 2012, Groshon filed an amended Charge of Discrimination that added the allegation that, "I filed the instant charge of discrimination and was not offered a severance package whereas employees did receive a severance package." (Dkt. Nos. 23 at pp. 29–30; 28 at p. 2.) The only basis for this allegation was that another employee, John Cook, who worked in a different department and was terminated two years before Groshon for alleged performance issues, received a severance package that Groshon did

not. (Dkt. Nos. 23 at pp. 29–30; 19-2 at pp. 206–08.) Groshon commenced this action on September 24, 2012.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In determining whether a genuine dispute of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000).

Where a proposed statement of fact is supported by the record and not adequately rebutted by the opposing party, the Court may "consider the fact undisputed for purposes of the motion." Fed.R.Civ.P 56(e)(2). An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted."). As the party opposing the motion for summary judgment, Groshon "gets the benefit of all facts that a reasonable jury might find." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 314 (7th Cir. 2011). "Deposition testimony, affidavits, responses to interrogatories, and other written statements . . . [are] perfectly admissible evidence

through which a party [may] present its side of the story at summary judgment." *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013); *see also Berry*, 618 F.3d at 691. Summary judgment is properly denied when the credibility of witnesses must be determined to resolve material factual issues, and also when the evidence put forth in support of the motion fails to establish the absence of a genuine dispute of material fact. *Spreen v. Brey*, 961 F.2d 109, 111 (7th Cir. 1992).

## DISCUSSION

I. The Age Discrimination Employment Act

    A. Recent Changes in the Seventh Circuit's Title VII Employment Discrimination Analysis

The ADEA prohibits employment discrimination against employees over the age of forty. *See* 29 U.S.C. § 621 *et seq*. Groshon argues that, as a result of his age, Trans Union singled him out for punishment and ultimately terminated his employment. He further argues that he received no severance package when he was terminated (without presenting evidence that he was entitled to one) because Trans Union was retaliating against him for reporting his alleged age-based discrimination to its Human Resources department and the EEOC.

To establish a violation of the ADEA, a plaintiff must demonstrate that he suffered an adverse employment action because of his age. *See Monaco v. Fuddruckers, Inc.*, 1 F.3d 658, 660 (7th Cir. 1993). A plaintiff must prove by a preponderance of the evidence that age was the "but for" cause of the employer's adverse employment decision. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175–78 (2009) (an act or omission is not considered a "but for" cause of an event if the event would have occurred without it). To do so "under current law," a plaintiff may show discrimination by utilizing either the direct or indirect methods of proof. *Perez v. Thorntons,*

*Inc.*, 731 F.3d 699, 703 (7th Cir. 2013) (citing *Collins v. Amer. Red Cross*, 715 F.3d 994, 999 (7th Cir. 2013)).

However, the differences between the "direct" and "indirect" tests are "narrowing," as a "majority of active judges in [the Seventh Circuit] have opined that the time has come to jettison the 'ossified direct/indirect paradigm' in favor of a simple analysis of whether a reasonable jury could infer prohibited discrimination." *Perez*, 731 F.3d at 703 (quoting *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J. concurring)). Judge Wood's concurrence in *Coleman* outlines an updated standard that has been approvingly cited (but not exclusively relied upon) by recent decisions rendered by the Seventh Circuit: "In order to defeat summary judgment, the plaintiff one way or the other must present evidence showing that she is in a class protected by the statute, that she suffered the requisite adverse action (depending on her theory), and that a rational jury could conclude that the employer took that adverse action on account of her protected class, not for any non-invidious reason. Put differently, it seems to me that the time has come to collapse all [the direct and indirect] tests into one." *Coleman*, 667 F.3d at 863. Nevertheless, the direct/indirect method has not been expressly abrogated, and the Seventh Circuit is still applying it (often in conjunction with the *Coleman* modification) when analyzing employment discrimination in the summary judgment context. *Andrews v. CBOCS W., Inc.*, 2014 WL 575893, *3, ⸺ F.3d ⸺ (7th Cir. Feb. 14, 2014); *Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 777 (7th Cir. 2013) (collapsing the direct/indirect test according to *Coleman* without expressly overruling it); *Perez*, 731 F.3d 703 (applying the direct/indirect method and highlighting the similarities between the tests). The Court's analysis reflects this increasingly streamlined standard, first by outlining the direct and indirect methods together below, and then by applying them to Groshon's facts in light of *Coleman*.

### B. The Direct and Indirect Methods

A plaintiff establishes unlawful discrimination under the direct method by presenting direct or circumstantial evidence that creates a "convincing mosaic of discrimination." *Winsley v. Cook County*, 563 F.3d 598, 604 (7th Cir. 2009). A plaintiff must put forth evidence that demonstrates he is a member of a protected class and as a result suffered the adverse employment action. *See Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 n.3 (7th Cir. 2006). The focus of the direct method of proof is not whether the evidence offered is "direct" or "circumstantial" but rather whether the evidence "points directly" to a discriminatory reason for the employer's action. *Id.* Direct evidence of discrimination essentially consists of an admission by the employer that it took an adverse employment action against an employee based upon prohibited animus. *See Rogers v. City of Chi.*, 320 F.3d 748, 753 (7th Cir. 2003). Sufficiently compelling circumstantial evidence of intentional discrimination under the direct method can consist of suspicious timing, ambiguous statements, differing treatment of similarly situated employees, personal animus, pretext, and other evidence that would allow the jury to reasonably infer discrimination. *See Hemsworth v. Quotesmith.com*, Inc., 476 F.3d 487, 491 (7th Cir. 2007). To survive summary judgment under the direct method, a plaintiff must prove that age was the "but for" cause of the adverse employment decision. *See Gross*, 557 U.S. at 175–78.

A plaintiff creates a presumption of unlawful discrimination under the indirect method by establishing a *prima facie* case of discrimination. *See Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1290 (7th Cir. 1997). To establish a *prima facie* case of discrimination under the ADEA, a plaintiff must put forth evidence that: (1) he belongs to a protected class; (2) he performed his job according to his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated more

favorably by the employer. *See Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2004). However, if a plaintiff establishes each of these elements, he creates a presumption that shifts the burden to the employer to "produce a legitimate, noninvidious reason for its actions." *Id.* at 673. If the employer satisfies its burden of production and rebuts plaintiff's prima facie case of discrimination, the burden shifts back to the plaintiff to show that the employer's reasons are false and only a pretext for discrimination. *Id.* at 672. Thus, satisfying the *prima facie* test under the indirect method is strikingly similar to the "circumstantial evidence" test under the direct method, as the Seventh Circuit duly noted in *Coleman* when it narrowed the gulf between the two tests.

## II. Count I – Age Discrimination

Genuine disputes of material fact prevent the Court from finding that Trans Union did not discriminate against Groshon due to his age. First, Groshon is a member of a protected class for the purposes of the Act because he is older than 40 years old. *See Martino v. MCI Communs. Servs.*, 574 F.3d 447, 453 (7th Cir. 2009). He suffered an adverse employment action because he was terminated from his job, which is a qualitative change in the condition of employment amounting to an adverse employment action. *See Johnson v. Cambridge Indus. Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). However, the material facts necessary to determine whether the actions Trans Union took were on account of his protected class are disputed, and a reasonable jury could conclude that they were, in fact, taken for invidious reasons.

The jury could reasonably believe that similarly situated Trans Union employees who were younger than Groshon were treated more favorably. The parties dispute facts essential to make this determination:

- Whether Groshon was singled out by Rabattini for reprimand on ticket handling and reporting issues (Dkt. No. 23 at p. 12);

- What Rabattini discussed with Groshon in their meetings, including the December 2010 meeting (*Id.* at pp. 14–15);

- Whether the projects Groshon's colleagues were working on were more demanding than Groshon's, thereby justifying disparate treatment, if any (*Id.* at p. 18); and

- How Trans Union's Human Resources Director, Pat Bradley, handled Groshon's age discrimination claims. (*Id.* at pp. 22–23.)

Rabattini's credibility is particularly crucial in analyzing these facts because she was responsible for making decisions on Trans Union's behalf regarding Groshon's employment and termination. As such, the parties strenuously argue about her trustworthiness. (Dkt. Nos. 21 at pp. 11–13; 42 at pp. 12–14.) It is not for this Court to make determinations as to witness credibility; that is the province of the jury. Here, a reasonable jury could find Groshon's version of events are true and conclude that he was discriminated against based on his age.

The material facts regarding Groshon's job performance are also disputed, but a reasonable jury could find that he performed his duties according to Trans Union's legitimate expectations, and therefore conclude that the reasons Trans Union gave for firing Groshon were pretext for illegal discrimination. Specifically, the parties dispute:

- Whether Groshon completed several Development Plans (Dkt. No. 23 at p. 7);

- Whether Groshon kept a clean work environment (*Id.* at p. 8);

- Whether Groshon met his ticket handling responsibilities (*Id.* at p. 11);

- Whether Groshon had ongoing performance issues (*Id.* at pp. 12–14); and

- The date Groshon's standardization project was due and whether he submitted it on time. (*Id.* at p. 15.)

The parties rely primarily on Rabattini and Groshon's conflicting affidavits and deposition testimony when discussing these disputed facts. This reliance again puts the credibility of Rabattini and Groshon directly at issue, and a reasonable jury could believe Groshon's version of the events. *See Spreen*, 961 F.2d at 111 ("Summary judgment is properly denied where an issue of material fact can be resolved only after a determination of the credibility of witnesses . . . ."). Because a reasonable jury could find that Groshon's characterization of his job performance was truthful and that Trans Union did not fire him for poor performance, the Court denies Trans Union's Motion for Summary Judgment as to Count I.

### III. Count II – Retaliation

Groshon alleges that Trans Union retaliated against him for complaining about his alleged age-based discrimination to Trans Union's human resources department and the EEOC because Trans Union subsequently denied him a severance package. (*See* Dkt. No. 1 at p. 5.) Trans Union argues summary judgment should be granted in its favor because this claim fails under both the direct and indirect methods. Groshon does not address Trans Union's motion as it pertains to his retaliation claim.

The ADEA prohibits employers from discriminating against employees who engage in a protected activity. *See* 29 U.S.C. § 623(d). Protected activities include those that employees engage in to oppose a practice made unlawful by the ADEA, including participating in investigations. *See id.* To demonstrate an adverse retaliatory action, a plaintiff must show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) (internal quotations omitted). Anti-retaliation statutes protect an individual from

retaliation that produces an injury or harm, not from all retaliation. *See id.* Snubbing, petty slights, and minor annoyances do not create such deterrence. *See id.* at 68–70.

In *Coleman*, Judge Wood made clear that the same simplified standard advocated for proving discrimination could and should also apply to proving retaliation. *Coleman*, 667 F.3d at 863. As such, the Court again outlines the traditional direct/indirect standard and then applies Groshon's facts to them pursuant to *Coleman*. To prove retaliation under the direct method, Groshon must demonstrate that he: (1) engaged in statutorily protected activity; (2) suffered an adverse employment action subsequent to this protected activity; and (3) a causal connection exists between the two. *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003). Under the indirect method, he must show that he: (1) engaged in a statutorily protected activity; (2) performed his job according to his employer's legitimate expectations; (3) despite his satisfactory job performance, that he suffered an adverse action from the employer; and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Id.*

### A. Protected Activity

The elements for both the direct and indirect method require a plaintiff to prove he was engaged in a protected activity. Here, Groshon's retaliation claim is based on his not receiving a severance package after he filed his Charge of Discrimination with the EEOC. (*See* Dkt. No. 19-2 at pp. 205–07.) Filing a Charge of Discrimination with the EEOC is "obviously" protected activity. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (quoting *Ajayi v. Aramark Bus. Serv., Inc.*, 336 F.3d 520, 533 (7th Cir. 2003)). Groshon therefore satisfies this prong of both the direct and indirect methods of showing retaliation.

### B. Adverse Action

Both the direct and indirect methods of proving retaliation also require a showing that the plaintiff suffered an adverse employment action. *See Burks*, 464 F.3d at 758 (direct method); *Atanus*, 520 F.3d at 677 (indirect method). Refusing to grant an employee a discretionary benefit to which he is not automatically entitled does not constitute an adverse action. *Hottenroth v. Vill. of Slinger*, 388 F.3d 1015, 1033 (7th Cir. 2004) (citing *Rabinovitz v. Pena*, 89 F.3d 482, 488–89 (7th Cir. 1996)); *see also Helzing v. Loyola Univ. of Chi.*, 2004 WL 1881780, at *10 (N.D. Ill. Aug. 16, 2004) (finding that not providing a severance package was not an adverse action because the plaintiff did not qualify for it).

Here, the only evidence of an adverse action Groshon puts forth is that he did not receive a severance package. He does not present any evidence that he was entitled to or promised a severance package, or that Trans Union regularly gives terminated employees severance packages. Nor does he present evidence showing that any other adverse action occurred, despite having ample opportunity to do so in his Rule 56.1 Statement of Additional Material Facts and in his Memorandum in Opposition to Trans Union's Motion for Summary Judgment. Instead, Groshon simply states in his deposition that he spoke to a former Trans Union employee named John Cook, and that Cook told Groshon he was terminated for performance issues but still received a severance package. This evidence is sufficient only to show that Groshon did not receive a "discretionary benefit," and is therefore not enough to prove that he suffered an adverse action under either the direct or indirect methods. *Hottenroth*, 388 F.3d at 1033.

### C. The Direct and Indirect Methods

Even if Groshon could demonstrate an adverse action in response to his protected activity, he presents no evidence of a causal link between his protected activity and the fact that

he did not receive a severance package—or even that he was eligible to receive such a package in the first place. First, Groshon's EEOC complaint could not have impacted his severance package because it was filed after he was terminated. *See Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 676 (7th Cir. 2011) ("When a retaliation claim is based on suspicious timing, the order of events is even more important than the time between them; the theory doesn't work if the retaliatory act precedes the protected activity." (citations omitted)). And his showing that he complained of his alleged discrimination to Trans Union's human resources department and was subsequently terminated without receiving a severance package is, without more, insufficient to show a causal link between the two events. *See Kodl v. Bd. of Educ. Sch. Dist. 45, Villa Park*, 490 F.3d 558, 563 (7th Cir. 2007) ("A temporal proximity between . . . claimed protected activities and [alleged adverse actions], standing alone, does not establish the requisite causal connection.").[2]

In addition, Groshon does not show that similarly situated employees who did not engage in protected activity were treated more favorably than he. He refers only to John Cook, a Trans Union employee who Groshon alleges said he was terminated for performance-related issues but nevertheless received a severance package. However, Trans Union notes that even if Groshon's allegations are correct, John Cook worked in a different department and was terminated two years before Groshon. John Cook was therefore not a similarly situated employee. Groshon does not present any evidence that any of his Desktop Service Technician peers were terminated for alleged performance issues and received severance packages during the sixteen-year period he worked for Trans Union. A reasonable jury therefore could not find that Trans Union

---

[2] Groshon does not argue that his termination was retaliation for complaining of the alleged discrimination to Trans Union's Human Resources department, but if he did, it would fail for the same reason: temporal proximity alone is insufficient to demonstrate retaliation.

retaliated against Groshon, and the Court grants Trans Union's Motion for Summary Judgment as to Count II.

## **CONCLUSION**

For the reasons set forth above, the Court denies Trans Union's Motion for Summary Judgment as to Count I (Age Discrimination) and grants it as to Count II (Retaliation).

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: February 21, 2014